IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

JAMES LEE JACKSON,
    Plaintiff,

vs.                                          Case No.: 3:16cv551/RV/EMT

JULIE L. JONES, et al.,
    Defendants.
_____/

## REPORT AND RECOMMENDATION

Plaintiff James L. Jackson ("Jackson"), an inmate of the Florida Department of Corrections ("FDOC"), is proceeding pro se and in forma pauperis in this civil rights action brought under 42 U.S.C. § 1983. Presently before the court is Jackson's Second Amended Complaint (ECF No. 15).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(C); *see also* 28 U.S.C. § 636(b)(1)(B), (C); Fed. R. Civ. P. 72(b). After careful consideration of all issues raised by Jackson, it is the opinion of the undersigned that this case should be dismissed, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).

I.      BACKGROUND

Jackson has convinced himself that he suffers from Crohn's Disease and will soon die. He is suing Thomas Reimers, the FDOC's Director of Health Services, and three members of the medical staff at Santa Rosa Correctional Institution (Nurse Derrick, Advanced Registered Nurse Practitioner ("ARNP") Nichols, and Dr. Rummel), where Jackson has been housed since January of 2016 (ECF No. 15 at 1–3).[1]

Jackson alleges that in January of 2014, two years prior to his being housed at Santa Rosa C.I., he sought medical treatment for the following symptoms: delirium, faintness, drowsiness, perpetual fatigue, dizziness, disorientation, inattentiveness, feebleness, numbness in his legs, fluctuating bouts of diarrhea and constipation, abnormal heartbeat, recurring outbreaks of skin sores, bouts of double vision, "abnormal sensory perceptions," abdominal cramps, nausea, bloating, gas, loss of appetite, "problematic" bowel movements, fissures on his perineum, and "flare-ups" of pain and inflammation in his colon, ileum, and rectum (ECF No. 15 at 6). Jackson alleges a doctor diagnosed him with "nutrient deficiency anemia" and prescribed nutritional supplements (an iron supplement, folic acid, vitamin B-12, and potassium), bentyl (used to treat irritable bowel syndrome by reducing stomach and intestinal

---

[1] The page references used in this Report reflect the page numbers as enumerated in the court's electronic docketing system rather than those Plaintiff may have assigned.

cramping), and a 4,000-calorie diet (*id.* at 7).  Jackson alleges his condition stabilized, and he was able to "function more properly" (*id.*).  Jackson alleges in June of 2014, a different doctor (at the same institution) discontinued the treatment without administering "proper examinations" to determine whether treatment was still necessary (*id.*).  Jackson alleges his condition "began to deteriorate" (*id.*).  Jackson alleges that from June of 2014 to January of 2016, he was examined multiple times by a doctor, two ARNPs, and a registered nurse, and he explained to them his medical history and previously diagnosed condition ("nutrient deficiency anemia"), but he was not provided any treatment.

On January 28, 2016, after Jackson's arrival at Santa Rosa C.I., Jackson complained to Defendant Nurse Derrick of intestinal pain, joint and neck pain, stiffness, dizziness, and fatigue (ECF No. 15 at 7).  Nurse Derrick asked Jackson what he believed the problem was, and Jackson responded that he believed he suffered from Crohn's Disease (*id.*).  Jackson requested a barium x-ray and/or colonoscopy to diagnose his condition (*id.*).  Nurse Derrick told Jackson that his symptoms were not consistent with Crohn's Disease, and she declined to refer Jackson to a doctor for examination (*id.* at 7–8).  On February 5, 2016, Jackson submitted an institutional grievance regarding Nurse Derrick's failure to provide medical treatment (*id.* at 8).

Jackson subsequently submitted a sick-call request and was seen by a non-Defendant nurse on April 27, 2016 (ECF No. 15 at 8). The nurse referred Jackson for an appointment with Defendant ARNP Nichols (*id.*).

On May 12, 2016, Jackson reviewed his medical file (ECF No. 15 at 8). Jackson reviewed the results of "multiple blood tests" and interpreted the results as indicating "exceedingly high levels of lymphs[sic]—i.e. white cells" (*id.*). Jackson submitted another sick-call request, and was seen by a non-Defendant nurse on May 19, 2016 (*id.*). The nurse again referred Jackson for an appointment with Defendant ARNP Nichols (*id.*).

Jackson subsequently submitted another sick-call request, and was seen by Defendant Nurse Derrick on June 20, 2016 (ECF No. 15 at 8). Jackson again explained his diagnosis in 2014 ("nutrient deficiency anemia") and his belief that he suffered from Crohn's Disease, which was causing dizziness, fatigue, and inattentiveness (*id.*). Nurse Derrick responded that she did not care what Jackson believed his medical condition was, she (Derrick) believed he suffered from hemorrhoids (*id.*). Nurse Derrick refused to order a barium x-ray or colonoscopy, and refused to refer Jackson to a doctor (*id.*). Jackson filed a formal grievance complaining that he was denied medical care (*id.* at 8–9). Defendant Dr. Rummel

responded that Jackson should utilize the sick-call process to receive a medical evaluation, and if the nurse believed that a referral to a clinician was necessary, a referral would be made (*id.* at 9). On July 12, 2016, Jackson appealed Rummel's response to the FDOC's Central Office (*id.*).

On or about July 23, 2016, Jackson filed an inmate request directed to non-Defendant Dr. Vilchez, requesting an appointment (ECF No. 15 at 9). Defendant ARNP Nichols intercepted the request and instructed Jackson to use the sick-call process if he desired medical attention (*id.*).

On August 8, 2016, Jackson declared a medical emergency because he felt faint, dizzy, confused, and disoriented, and his neck was stiff and painful (ECF No. 15 at 9). A non-Defendant nurse took Jackson's vital signs, noted that Jackson's eardrums, tonsils, and sinuses were inflamed, and determined that his condition was non-emergent (*id.*). The nurse instructed Jackson to submit a sick-call request (*id.*). The next day, Jackson was seen by Defendant Nurse Derrick (*id.*). Nurse Derrick documented Jackson's symptoms and provided Jackson with three fecal occult blood test sample cards (apparently in response to Jackson's complaint of blood in his stool) (*id.*). Correctional officers advised Jackson to inform them if he needed Tylenol (*id.*).

On September 2, 2016, Jackson was seen by two non-Defendant nurses (ECF No. 15 at 9–10). Jackson complained that he was experiencing drowsiness, fatigue, a stiff and painful neck, inability to think and concentrate, pain in his lungs, difficulty breathing, coughing up blood, pain in his lower intestine and rectum, excessive bowel movements, pain and stiffness in his pelvis, numbness in his legs, and difficulty walking (*id.*). The nurses examined Jackson, and one of the nurses diagnosed him with swollen eardrums and sinuses (*id.*). The nurse provided saline nasal spray and an antihistamine (*id.* at 10).

Jackson reviewed his medical file again on September 23, 2016, which included records from 2011 to the present (ECF No. 15 at 10). Jackson again noted that multiple blood test results indicated "abnormal levels of lymphs[sic]—i.e. white cells" (*id.*).

On September 26, 2016, Defendant Health Services Director Reimers responded to Jackson's July 12 grievance appeal (ECF No. 15 at 9). Reimers stated that Dr. Rummel's response to Jackson's formal grievance was appropriate (*id.*). Director Reimers noted that Jackson was seen by Nurse Derrick on August 9, 2016, and that Jackson should have addressed any medical issues with Nurse Derrick at that time (*id.*).

On September 21, 2016, Jackson submitted a request for mental health assistance (ECF No. 15 at 10). Jackson was interviewed by a non-Defendant mental health practitioner on October 10, 2016 (*id.*). Jackson explained "the progressive onset" of his symptoms and "the degeneration of his psych" (*id.*). Jackson informed the mental health practitioner that he believed he was dying (*id.*).

Jackson commenced this lawsuit on October 12, 2016 (ECF No. 1 at 1). Two days later, Jackson complained to a correctional officer that he was being denied medical treatment (ECF No. 15 at 11). Jackson was seen by non-Defendant Nurse Svaboda, who documented Jackson's symptoms, noted that he (Svaboda) had previously seen Jackson for the same symptoms and referred him to ARNP Nichols, and told Jackson that he would again make a referral to ARNP Nichols (*id.*).

On October 31, 2016, Jackson submitted a sick-call request and was seen by non-Defendant Nurse Nash (ECF No. 15 at 11). Jackson complained that he had recurring skin sores containing pus, itchy skin, pain in his pelvis, groin, and testicles, spinal pain, stiff neck, joint pain, blurry vision, fatigue, feebleness, difficulty walking, and difficulty concentrating (*id.*). Jackson informed Nurse Nash that he had been diagnosed with Chlamydia ten years ago, and he believed he may still be infected (*id.*). Nurse Nash referred Jackson to Defendant ARNP Nichols, and Jackson was

seen by Nichols on November 7, 2016 (*id.*). ARNP Nichols prescribed triamcinolone acetonide ointment for the skin sores (*id.*). Jackson began explaining his other symptoms, but ARNP Nichols told Jackson that he would need to return to sick-call for his other complaints (*id.*).

Jackson was transferred to Franklin Correctional Institution from November 7, 2016 to December 22, 2016 (ECF No. 15 at 11–12). There, he complained of spinal and neck pain, fatigue, dizziness, and difficulty walking (*id.*). Jackson received an x-ray of his neck and spine (*id.* at 12). Jackson was diagnosed with a muscle spasm in his neck and prescribed a muscle relaxer (*id.*). A doctor also ordered monitoring of Jackson's blood pressure, which averaged in the range of 145/85 to 150/90 (*id.*). Jackson self-describes this as "abnormally high" (*id.*). While at Franklin C.I., Jackson also met with a nurse, at Jackson's request, to designate a health care surrogate and execute a living will (*id.*). Jackson described his condition and the pattern of "flare-ups" of his symptoms (which he stated left him "debilitated") and remission of his symptoms (which he stated left him feeling "relatively normal") (*id.*). Jackson alleges the nurse asked him if he had heard of Crohn's Disease, and he responded that indeed he had heard of the disease and believed he suffered from it (*id.*). Jackson alleges the nurse asserted that Jackson's history (including being born prematurely and abusing

alcohol and drugs from a young age) may have caused inflammation and malabsorption in his digestive tract (*id.*).

Upon Jackson's return to Santa Rosa C.I. on December 22, 2016, Jackson submitted a sick-call request and was seen by a non-Defendant nurse (ECF No. 15 at 13). Jackson described his numerous symptoms, and the nurse stated that Jackson's issues may be psychological in nature, instead of medical (*id.*). Jackson was seen by a mental health practitioner on January 4, 2017, to whom he voiced his concern that he was dying (*id.*). Jackson requested an appointment with a psychiatrist (*id.*). The next day, Jackson was seen by an ARNP in psychiatry (*id.*). Jackson again explained his symptoms and the "progressive worstening [sic]" of his health (*id.*). The ARNP reviewed Jackson's medical file and noted that all of his test results were normal (*id.*). The ARNP suggested that Jackson could be suffering from a chemical imbalance, and suggested a low dosage of Zoloft (*id.*). Jackson agreed to try the Zoloft (*id.*).

On January 6, 2017, Jackson was seen by a non-Defendant nurse, who discovered that Jackson's eardrums, tonsils, and sinuses were severely inflamed (ECF No. 15 at 13). The nurse proscribed an antihistamine and referred Jackson to Defendant ARNP Nichols (*id.*). ARNP Nichols prescribed a 10-day course of antibiotics (*id.*).

Jackson alleges he is currently experiencing the following symptoms: Neurological degeneration, bouts of delirium, gradual onset of dementia, difficulty thinking and concentrating, inattentiveness, dizziness, drowsiness, chronic fatigue, lethargy/lack of energy, involuntary muscle spasms, "abnormal sensory perceptions," spastic movements, difficulty with balance and coordination, joint pain, stiffness, spinal pain, pain in his groin and pelvis, shortness of breath, pain and heaviness in his lungs, abnormal heartbeat, numbness in his extremities, rectal pain, rectal polyps, intestinal pain, bloating, nausea, blood and mucus in his stool, dry mouth, skins sores containing pus, inflamed eardrums and sinuses, inflamed tonsils, dry skin, blurry and double vision, difficulty walking, "urine retention," "fecal incontinence," a "perpetual chill," and anal fissures on his perineum (ECF No. 15 at 13–14).

Jackson claims that Defendants have been deliberately indifferent to his medical needs, in violation of the Eighth Amendment (ECF No. 15 at 16–21).  He seeks declaratory relief and compensatory and punitive damages (*id.* at 16, 22).  Jackson also seeks an injunction requiring Defendants to: (1) immediately provide him a medical examination by a gastroenterologist or "other qualified specialist" and any prescribed treatment; (2) immediately provide him an endoscopy and/or a Barium x-ray and an MRI to screen for inflammatory bowel/Crohn's Disease, colorectal cancer,

and subacute degeneration of the spinal cord; (3) immediately test his levels of cobalamin/B-12, iron, phosphate, folate, calcium, and thiamine, and provide regular injections of the deficient nutrients; (4) immediately transport him to a medical center with the proper equipment and facilities to diagnose and treat his condition; and (5) provide all necessary treatments and therapies for his recovery (*id.* at 22).

## II. DISCUSSION

The court is statutorily required to review the Second Amended Complaint to determine whether this action is frivolous or malicious, fails to state a claim on which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief. *See* 28 U.S.C. § 1915(e)(2)(B). To survive dismissal at the screening phase, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (internal quotation marks and citation omitted). A claim is plausible on its face where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted). Plausibility means "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line

between possibility and plausibility of entitlement to relief." Id. (quotation and citation omitted).

The determination of whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679 (citation omitted). The pleader is not entitled to relief "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." Id. (citing Fed. R. Civ. P. 8(a)(2)). The court is "not bound to accept as true a legal conclusion couched as a factual allegation." Id. at 678 (quotation and citation omitted). And "bare assertions" that "amount to nothing more than a formulaic recitation of the elements" of a claim "are conclusory and not entitled to be assumed true." Id. at 681 (quotation and citation omitted). Stated succinctly:

> Pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

Iqbal, 556 U.S. at 679. In civil rights cases, "[m]ore than mere conclusory notice pleading is required . . . . A complaint will be dismissed as insufficient where the

allegations it contains are vague and conclusory." Gonzalez v. Reno, 325 F.3d 1228, 1235 (11th Cir. 2003) (quotation marks and alteration omitted).

The Eighth Amendment prohibits infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. Stating a claim under the clause thus requires satisfying two minima (from which the case law has ultimately derived four requirements). First, there must be, objectively speaking, conduct by public officials "sufficiently serious" to constitute a cruel or unusual deprivation—one "denying 'the minimal civilized measure of life's necessities.'" Wilson v. Seiter, 501 U.S. 294, 298, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991) (quoting Rhodes v. Chapman, 452 U.S. 337, 347, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981)). Second, there must be a subjective intent by the public officials involved to use the sufficiently serious deprivation in order to punish. *See* Wilson, 501 U.S. at 300 ("The source of the intent requirement is not the predilections of this Court, but the Eighth Amendment itself, which bans only cruel and unusual *punishment*. If the pain inflicted is not formally meted out *as punishment* by the statute or the sentencing judge, some mental element must be attributed to the inflicting officer before it can qualify." (emphasis in original)).

In the context of denial of medical care, each of these minima has been more specifically described as encompassing two subsidiary requirements.  To show an objectively serious deprivation, it is necessary to demonstrate, first, an objectively "serious medical need[ ]," Estelle v. Gamble, 429 U.S. 97, 104, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976), one that, if left unattended, "pos[es] a substantial risk of serious harm," Farmer v. Brennan, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994).  A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003).  Second, it is necessary to demonstrate that the response made by the public official to that need was poor enough to constitute "an unnecessary and wanton infliction of pain," and not merely accidental inadequacy, "negligen[ce] in diagnosi[s] or treat[ment]," or even "[m]edical malpractice" actionable under state law, Estelle, 429 U.S. at 105–06.[2]  Similarly, to show the required subjective intent to punish, a plaintiff must demonstrate that the public official acted with an attitude of "deliberate indifference," Estelle, 429 U.S. at 105, which is in turn defined as

---

[2] A corollary to this requirement for a great deal more than negligence is that a public official who does act reasonably in response to a serious medical need "cannot be found liable under the Cruel and Unusual Punishments Clause," Farmer, 511 U.S. at 845, "even if the harm ultimately was not averted," *id.* at 844.

requiring two separate things: "aware[ness] of facts from which the inference could be drawn that a substantial risk of serious harm exists [ ] and . . . draw[ing of] the inference," Farmer, 511 U.S. at 837. Ultimately, there are thus four requirements: an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need, and an actual inference of required action from those facts. See Taylor v. Adams, 221 F.3d 1254, 1258 (11th Cir. 2000).

Finally, in the prison context, the court must "distinguish between evidence of disputed facts and disputed matters of professional judgment." Beard v. Banks, 548 U.S. 521, 530, 126 S. Ct. 2572, 165 L. Ed. 2d 697 (2006). A medical decision not to pursue a particular course of diagnosis or treatment is a classic example of a matter for medical judgment, an exercise of which does not represent cruel and unusual punishment. See Estelle, 429 U.S. at 107–08. Moreover, "[w]here a prisoner has received . . . medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in tort law." Hamm v. Dekalb Cnty., 774 F.2d 1567, 1575 (11th Cir. 1985) (quotation omitted).

Here, Jackson's factual allegations do not plausibly suggest that any named Defendant was deliberately indifferent to a serious medical need. When Jackson

arrived at Santa Rosa C.I. in January of 2016, he had no diagnosed medical need. During the ten-month period from January of 2016 to Jackson's commencing this lawsuit, Jackson was seen by medical staff on six occasions for his medical complaints.  Using the diagnostic methods they deemed appropriate for Jackson's subjective complaints (including providing Jackson with stool sample cards in response to his complaints of blood in his stool), and based upon medical staff's objective observations and findings, the medical staff twice diagnosed Jackson with only two conditions requiring medical treatment, namely, swollen eardrums, tonsils, and sinuses (which were diagnosed on three occasions) and skin sores.  The other symptoms of which Jackson complained were not diagnosed as requiring medical treatment, nor were his symptoms so obvious that a lay person would easily recognize the necessity for a doctor's attention.  Jackson's diagnosed medical conditions were treated (the swollen eardrums, tonsils, and sinuses were treated with a combination of nasal spray, antihistamines, and antibiotics; and the skin sores were treated with triamcinolone acetonide ointment).  Additionally, the medical staff referred Jackson to mental health professionals for assessment of any psychological condition and treatment for any diagnosed conditions. Jackson's disagreement with Defendants' failure to include a Barium x-ray or colonoscopy in the course of treatment, and

Jackson's disagreement with Defendants' diagnoses and treatments of his conditions, do not state a claim of deliberate indifference. A medical decision not to pursue a particular course of diagnosis or treatment is a classic example of a matter for medical judgment, an exercise of which does not represent cruel and unusual punishment under the Eighth Amendment. *See* Estelle, 429 U.S. at 107–08.

For the aforementioned reasons, it is respectfully **RECOMMENDED**:

1. That this case be **DISMISSED with prejudice**, under 28 U.S.C. § 1915(e)(2)(B)(ii), for failure to state a claim upon which relief may be granted.

2. That the clerk of court be directed to enter judgment accordingly and close the file.

At Pensacola, Florida, this 22nd day of March 2017.

/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

### NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u> A copy of objections shall be served upon all other parties. If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**